UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KATHLEEN BURGHARDT-COBB,

Plaintiff,

v.

MARK S. INCH, Director, Federal Bureau of Prisons,

Defendant.

No. 1:17-cv-01563-DAD-SKO

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

(Doc. No. 27)

This matter came before the court on October 16, 2019, for hearing on defendant's motion for summary judgment. (Doc. No. 27.) Attorney Kevin Little appeared on behalf of plaintiff. Assistant United States Attorney Benjamin Hall appeared on behalf of defendant. Having reviewed the parties' briefing and heard oral argument, and for the reasons set forth below, the court will deny defendant's motion.

/////

/////

/////

/////

/////

/////

**BACKGROUND**[1]

Plaintiff Kathleen Burghardt-Cobb worked at the Federal Correctional Institution in Mendota, California ("FCI Mendota") as a trust fund supervisor. (Doc. No. 27-2 at ¶ 1.) The Federal Bureau of Prisons ("BOP") designated that job as a law enforcement position. (*Id.* at ¶ 2.) According to the written job description, the trust fund supervisor is "charged with responsibility for maintaining security of the institution," and these duties "precede all others required by this position and are performed on a regular and recurring basis." (*Id.* at ¶ 3.) The trust fund supervisor's duties "include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary." (*Id.* at ¶ 4.) The trust fund supervisor must also "shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies." (*Id.*) The trust fund supervisor "may enter into hostile or life threatening situations and may be required to make decisions affecting the life, well-being, civil liberties, and/or property of others" and must complete specialized training in firearms proficiency and self-defense. (*Id.* at ¶ 5.)

All BOP positions at correctional institutions are hazardous duty law enforcement officer positions and require individuals to be physically able and medically qualified to perform correctional work safely and successfully. (*Id.* at ¶ 6.) In accordance with BOP's human resource management manual, BOP employees who work in these positions must be able to perform and meet fourteen physical requirements in connection with their federal law

---

[1] This factual background is based on defendant's statement of undisputed facts. (Doc. No. 27-2.) A party opposing a motion for summary judgment can file a statement of disputed facts, "and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication." Local Rule 260(6). Here, although plaintiff submitted a statement of disputed facts, each of the disputes noted by plaintiff therein are actually legal arguments, do not challenge the veracity of the underlying facts, or are irrelevant. (*See* Doc. No. 32 at ¶¶ 2–7, 14, 18.) The court therefore considers the material facts of this case to be undisputed. *See Arvakhi v. Castro*, No. 2:14-cv-02816 CAS (Ex), 2015 WL 6039119, at *4 (C.D. Cal. Oct. 15, 2015) ("[W]hile the Court recognizes that plaintiff generally takes issue with defendants' statement of undisputed facts, to the extent an evidentiary conflict is not readily apparent, the Court accepts as undisputed defendants' supporting evidence."), *aff'd sub nom. Arvakhi v. Clemmensen*, 678 F. App'x 546 (9th Cir. 2017).

enforcement positions, and must have the ability to use various firearms, including pistols, rifles and shotguns, as well as to perform self-defense movements. (*Id.* at ¶ 7.)

In December 2012, plaintiff had spinal surgery. (*Id.* at ¶ 8.) Following her surgery, plaintiff submitted to the BOP a letter dated March 26, 2013 from Stanford Hospital and Clinics. (*Id.* at ¶ 9.) The letter stated that plaintiff was released to return to work on April 8, 2013 and set out restrictions on her work activities for the next six months, including no running, "stand[ing] for a prolonged amount of time, [and] no bending and no lifting greater than 10 pounds for the next 6 months." (*Id.* at ¶ 9–10.) By letter dated April 4, 2013, FCI Mendota Associate Warden of Operations Steve Lake offered plaintiff an accommodation with respect to her workplace duties for a duration of six months. (*Id.* at ¶ 10.) Plaintiff accepted the offer of accommodation the same day. (*Id.*)

On or about September 16, 2013, plaintiff submitted to the BOP a letter from her physician assistant announcing continuing restrictions on her activities for an additional six month period. (*Id.* at ¶ 11.) The letter stated that plaintiff

> should continue to avoid running, prolonged standing, prolonged bending and no lifting greater than 10 lbs. She should also avoid participation with firearms, including any re-qualification shooting. These restrictions apply for the next 6 months.

(*Id.*) The same day, plaintiff submitted a Firearms Training Temporary Medical Waiver Form, stating that her condition prevented her from firing a weapon or participating in self-defense activities and indicating that her anticipated date of recovery, or the date when she could re-qualify, was March 16, 2014. (*Id.* at ¶ 12.) On or about March 19, 2014, plaintiff submitted to the BOP a letter dated March 17, 2014, from her neurologist, setting forth further restrictions on her workplace activities until December 31, 2014. (*Id.* at ¶ 13.) The letter listed the following restrictions:

> No prolonged standing more than 10 minutes; No lifting more than 10 pounds; No bending; No running; She cannot do re-qualification testing with firearms due to the recoil pressure and the requirement to stand more than 10 minutes.

(*Id.* at ¶ 13.)

On July 25, 2014, Associate Warden Nicklin issued a letter to plaintiff, requesting eight categories of additional information regarding her condition and assigning plaintiff to temporary alternative duties until August 22, 2014. (*Id.* at ¶ 14.) Plaintiff submitted a response to Associate Warden Nicklin that included a second letter from her neurologist dated August 8, 2014, and a completed DOJ Form 100A Request for Reasonable Accommodation dated August 21, 2014. (*Id.* at ¶ 15.) The second letter from plaintiff's neurologist stated that plaintiff's "lumbar spine degenerative disease is increasingly severe. Any return to full recovery will require a lumbar surgery which hopefully will allow a return to her usual job." (*Id.*) Noting that plaintiff "ha[d] not progressed to the point [where] the lumbar surgery [was] necessary now," the letter reiterated the restrictions set forth in the neurologist's March 17, 2014 letter. (*Id.*) It further explained that plaintiff "cannot do the requalification firearm restriction test because of the requirement to stand for 10 minutes and the possibility that the recoil pressure of the firearm will cause acute pain and cause a risk of losing control of her gun." (*Id.*) In her DOJ Form 100A Request for Reasonable Accommodation, plaintiff requested that she be excused from (1) physically responding into the secure institution in the event of an emergency situation, (2) re-certifying with firearms, and (3) completing annual self- defense training. (*Id.* at ¶ 17.) On November 17, 2014, Patricia E. Jones, Acting Human Resources Manager for FCI Mendota, denied plaintiff's request to continue temporary alternative duties until December 31, 2014, on the grounds that granting that request would require the waiving of essential functions of plaintiff's position. (*Id.* at ¶ 18.)

On November 21, 2017, plaintiff commenced this action asserting causes of action related to disability discrimination and retaliation against defendant Mark S. Inch in his capacity as Director of BOP. (Doc. No. 1.) Plaintiff seeks a judgment directing defendant to end BOP's allegedly widespread practice of reprisal against employees who file EEO and EEOC claims; an award of money damages, costs and fees associated with litigating this case; and such other relief as may be deemed appropriate. (*Id.* at 8.) On July 17, 2019, defendant filed the pending motion for summary judgment as to plaintiff's claim brought under the Rehabilitation Act. (Doc. No. 27.) Plaintiff filed an opposition on August 21, 2019 , and defendant replied on August 28, 2019. (Doc. Nos. 31, 36.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[2]

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

---

[2] Plaintiff suggests that defendant has actually moved for summary adjudication—not summary judgment—because the pending motion addresses only plaintiff's Rehabilitation Act claim and not her Title VII reprisal claim. (Doc. No. 33 at 2.) At the hearing on the motion, the undersigned clarified that summary judgment can be granted as to a single claim, and the distinction that plaintiff's counsel seeks to make is one without a difference. Plaintiff's counsel agreed with this observation. As such, the court treats this motion as one for summary judgment under Federal Rule of Civil Procedure 56.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where

/////

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

As noted, defendant moves for summary judgment as to plaintiff's claim brought pursuant to the Rehabilitation Act on the grounds that there is no genuine dispute as to any material fact and that defendant is entitled to judgment as a matter of law. (Doc. No. 27 at 1.) The gravamen of defendant's motion is that because it is undisputed plaintiff could not perform the "essential functions" of her job, she is not a "qualified individual" under the Rehabilitation Act and therefore cannot assert a cognizable claim for failure to accommodate her request for accommodation. (Doc. No. 27-1 at 9.)

**A. The Declaration Submitted by Defendant is Not Undisclosed Expert Testimony That Should Be Excluded From Consideration**

The court first addresses plaintiff's argument that the declaration of Sylvie Cohen, M.D. (Doc. No. 27-3) should be excluded from evidence on summary judgment because defendant did not disclose expert testimony from this witness in accordance with the scheduling order. (Doc. No. 33 at 11.) Dr. Sylvie Cohen is Chief of the Occupational & Employee Health Branch in the Health Services Division of BOP. (Doc. No. 27-3 at ¶ 1.) Plaintiff argues that Dr. Cohen's declaration is undisclosed expert testimony that violates Federal Rule of Civil Procedure 37(c)(1). (*Id.* at 11.) Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26(a) or (e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Plaintiff appears to have focused on to the word "expert" as used in Dr. Cohen's declaration and assumed that defendant must have offered the declaration as expert opinion testimony on summary judgment. (*See* Doc. No. 27-3 at ¶ 3) (listing the responsibilities of Dr. Cohen's position as including "expert consultation to staff of the Office of General Counsel, Human Resources and executive staff for the Correctional Institutions regarding Occupational Health and to provide and evaluate medical services for the agency's workforce"). However, the substance of Dr. Cohen's declaration addresses the operations of her office within the BOP based

upon her own personal knowledge. (*See generally id.*) The statements made by Dr. Cohen in her declaration are not based on any specialized knowledge requiring her to be qualified as an expert witness. *See United States v. Leon-Gil*, 53 F. App'x 847, 849 (9th Cir. 2002)[3] (finding that a witness "was a percipient fact witness because he testified to his own common observations," and his "testimony required no 'scientific, technical, or other specialized knowledge' that required the Government to qualify [him] as an expert"). The court concludes that Dr. Cohen's declaration does not present an expert opinion.[4] As such, defendant was not required to disclose Dr. Cohen or her testimony pursuant to the scheduling order's requirements with respect to disclosure of experts. (Doc. No. 15 at 3.)

**B. There is a Genuine Dispute as to Whether Plaintiff Could Perform The Essential Functions of Her Job**

The court now turns to the sole ground upon which defendant has moved for summary judgment as to plaintiff's Rehabilitation Act claim: that plaintiff was not a "qualified individual" and therefore cannot assert a cognizable claim based on defendant's alleged failure to accommodate her request. (Doc. No. 27-1 at 9.) Defendant lists three job functions from which plaintiff sought to be excused—firearms qualification, self-defense training, and physically

/////

/////

/////

/////

---

[3] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

[4] Plaintiff also argues that the Cohen declaration improperly provides an opinion on a question of law by stating that plaintiff is not a qualified person with a disability. (Doc. No. 33 at 11.) Of course, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Here, the court has already found that Dr. Cohen is not an expert witness. Nevertheless, defendant's counsel agreed in reply (*see* Doc. No. 36 at 9 n.2) and at the hearing on the motion that the court need not consider the opinion stated in paragraph 9 of the Cohen declaration. The court also notes that defendant's motion for summary judgment does not rely upon this particular paragraph of the declaration. Accordingly, the court has not considered that statement in resolving the pending motion.

responding into the secure institution in the event of an emergency situation[5]—and contends that each is an "essential function" of plaintiff's job that she could not perform, thereby rendering her unqualified for relief under the Act. (Doc. No. 27-4 at 9.)

The Rehabilitation Act prohibits employment discrimination on the basis of disability. 29 U.S.C. §§ 791 et seq. Section 501 of the Act expressly invokes the substance of the Americans with Disabilities Act (the "ADA"), and thus the Ninth Circuit looks to the standards applied under the ADA to determine whether a violation of the Rehabilitation Act occurred in the federal employment context. *See Coons v. Sec'y of the U.S. Dept. of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) ("The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act"); *Lopez v. Johnson*, 333 F.3d 959, 961 (9th Cir. 2003) ("Section 501 borrows its substantive standards from the Americans with Disabilities Act (ADA).") (citing 29 U.S.C. § 791(g)). "To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for the position, and (3) suffered discrimination because of her disability." *Walraven v. Geithner*, 363 F. App'x 513, 514 (9th Cir. 2010);[6] *see also E.R.K. ex rel. R.K. v. Hawaii Dept. of Education*, 728 F.3d 982, 992 (9th Cir. 2013) ("A prima facie case under the Rehabilitation Act is identical, except that the plaintiff must also prove that the relevant program receives federal financial assistance.") A plaintiff bears the burden of showing she is "qualified" for a position by demonstrating that she was "able to perform the essential functions of the position at the time of the discrimination with or without reasonable accommodation." *Walraven*, 363 F. App'x at 514; *see also* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m). However, an employer disputing that plaintiff "can perform the essential

---

[5] Throughout the motion and its reply brief, defendant refers to this essential function as both "physically responding to emergencies inside the secure institution" and "physically responding into the secure institution in the event of an emergency situation." (*See, e.g.*, Doc. Nos. 27-1 at 9, 12; 36 at 6, 8.) Because the essence of defendant's argument is that plaintiff's accommodation request constituted a request to waive the essential functions of her job, the court will use the exact language of plaintiff's request: "physically responding into the secure institution in the event of an emergency situation." (Doc. No. 27-4 Ex. A-8 at 39.)

[6] *See* fn. 3, above.

functions must put forth evidence establishing those functions." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007).

"'Essential functions' are 'fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." *Id.* at 989 (citing 29 C.F.R. § 1630.2(n)(1)). "'Essential functions' are not to be confused with 'qualification standards,' which an employer may establish for a certain position. Whereas 'essential functions' are basic 'duties,' 'qualification standards' are 'personal and professional attributes' that may include 'physical, medical [and] safety' requirements." *Id.* at 990 (internal citations omitted). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). However, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1071 (9th Cir. 2000), *overruled on other grounds Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002); *see also U.S. E.E.O.C. v. MJC, Inc.*, 400 F. Supp. 3d 1023, 1032 (D. Haw. 2019). Thus, job descriptions are inconclusive evidence of essential functions, *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001), and the EEOC has also recognized that not all functions listed in a job description are necessarily essential, (*see* Doc. No. 34-1, Ex. N). In considering what is an essential job function of a particular job, a court may also consider "[t]he amount of time spent on the job performing the function; [t]he consequences of not requiring the incumbent to perform the function; [t]he terms of a collective bargaining agreement; [t]he work experience of past incumbents in the job; and/or [t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n); *see also Roness v. T-Mobile USA, Inc.*, 394 F. Supp.3d 1324, 1330 (W.D. Wash. 2019).

Finally, it is important to recognize that determining the essential functions of any particular job is a question of fact which, if the facts are disputed, must be determined by the finder of fact. *See Bates*, 511 F.3d at 991–92 (citing *Taylor v. Rice*, 451 F.3d 898, 907 (D.C. Cir. 2006) (concluding that issues of fact regarding a job's essential functions precluded summary

judgment for the employer because the record showed that, in practice, employer did not require all other employees to abide by the claimed essential function); *Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1191 (10th Cir.2003) ("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement."); *McMillan v. Valley Rubber & Gasket Co., Inc.*, No. 2:14-cv-01359-TLN-KJN, 2017 WL 3383120, at *5 (E.D. Cal. Aug. 7, 2017) (recognizing that, in the context of a state law claim for disability discrimination, "[w]hether something constitutes an essential job function . . . is a question of fact" and that such a determination "is a highly fact-specific inquiry"); *Weeks v. Union Pacific Railroad Co*., 137 F. Supp. 3d 1204, 1223 (E.D. Cal. 2015) ("The determination of essential job functions is generally a question of fact."); *EEOC v. CTI, Inc*., CV-13-1279-TUC-DCB, 2015 WL 11120707, at * 7 (D. Az. May 8, 2015) ("Since a determination of the essential job functions is a fact-specific inquiry, where questions of fact exist as to whether particular tasks are essential functions of the plaintiff's position and whether the plaintiff can perform those tasks, summary judgment must be denied.")

In moving for summary judgment here, defendant asserts that firearms qualification, self-defense training, and physically responding into the secure institution in the event of an emergency situation are all essential job functions of the trust fund supervisor position held by plaintiff. The court considers each below.

1. <u>Firearms Qualification</u>

In attempting to establish that firearms qualification is an essential function of plaintiff's job, defendant relies primarily on the written description for the trust fund supervisor position. (Doc. No. 27-1 at 10–12.) The description states as follows in relevant part:

> Along with all other correctional institution employees, incumbent is charged with responsibility for maintaining security of the institution. **The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.**
>
> [ . . . ]

/////

/////

> Incumbent must successfully complete **specialized training in firearms proficiency,** self defense, management of medical emergencies, safety management and interpersonal communication skills.

(Doc. No. 27-4 Ex. A-1 at 15, 16) (emphasis added). Defendant has also submitted a declaration from Dr. Cohen, M.D., the Chief of BOP's Occupational & Employee Health Branch, stating that all BOP positions in correctional institutions are hazardous duty law enforcement officer positions, and noting that the human resource management manual requires hazardous duty law enforcement officers to be able to use various firearms. (Doc. No. 27-3 at ¶¶ 5, 6.).

In opposing summary judgment with respect to her Rehabilitation Act claim, plaintiff has submitted declarations from Ken White and Glen Cobb, former and current United States Penitentiary Atwater Lieutenants and supervisors of BOP employees (Doc. Nos. 34-1 Ex. G at ¶ 1, 2; Ex. H at ¶ 1, 2); and Lourdes Mettry, a former United States Penitentiary Atwater Health Services Administrator whose position required attending meetings to consider the physical limitations of BOP employees (Doc. No. 34-1 Ex. I at ¶ 1–2). White and Cobb declare that "it is hardly the case that all active employees have been at all times firearms qualified." (Doc. Nos. 34-1, Ex. G ¶ 5; Ex. H ¶ 5.) Additionally, all three declarations presented by plaintiff aver that "while firearms certification is a hiring requirement, there are a number of Bureau of Prisons employees who continue to work while being on their institution's 'No Shoot List,' either for lack of certification, injury or disability, or other unstated reasons." (Doc. Nos. 34-1, Ex. G ¶ 5; Ex. H ¶ 5; Ex. I ¶ 5.) "This is possible because firearms certification is not connected to the day-to-day duties of the great majority of Bureau of Prisons employees," and "Bureau of Prisons employees who interact with inmates, either on the corrections or administrative sides of an institution, do not carry firearms." (*Id.*) White and Cobb also add the following in their declarations:

> For example, if on a typical day USP Atwater has approximately 200 employees, I would estimate about three to five percent carry firearms, and those would mostly be correctional officers assigned to tower posts, or those who are assigned to transport inmates from the facility to another location. While in the event of a crisis, such as a riot, more correctional officers who need to be able to use firearms, even in that context it would be a minority of the on-duty officers. For people, like the plaintiff, whose duties are primarily limited to

> the administrative operations of the facility, there is even less of a need for firearms possession or use.

(Doc. Nos. 34-1, Ex. G ¶ 5; Ex. H ¶ 5.)

Defendant argues that the declarations submitted by plaintiff in opposition to summary judgment should be disregarded because the declarants only claim knowledge of unnamed "injured individuals" who purportedly held unspecified positions at unspecified locations within the BOP, and that those declarations fail to specify even whether the unnamed individuals held hazardous-duty, law-enforcement officer positions. (Doc. No. 36 at 7.) The court finds defendant's arguments in this regard unpersuasive. Evidence the court may consider in determining whether job functions are essential includes, *but is not limited to*, "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n). The evidence presented by plaintiff in the form of these declarations falls within these parameters. They constitute evidence from former and current BOP supervisors who are familiar with BOP's day-to-day practices pertaining to disability and firearms certification, self-defense training, and emergency response. (*See* Doc. Nos. 34-1, Ex. G ¶ 2; Ex. H ¶ 2; Ex. I ¶ 2.) Each declaration addresses how injured BOP employees, like plaintiff, were allowed to navigate their injuries even though their injuries prevented them from performing certain functions. (*See generally* Doc. Nos. 34-1, Ex. G, Ex. H, Ex. I.)

Defendant also points to plaintiff's deposition at which she conceded that firearms certification is listed as a requirement for the trust fund supervisor position and all other staff working at FCI Mendota. (Doc. No. 36 at 3; *see also* Doc. No. 34-1, Ex. A at 39:16–40:6.) However, the court reads the cited portion of plaintiff's deposition merely as agreeing that her written job description listed the certification as a requirement for her position, not that it is in fact essential to her job. *Cf. Kees v. Wallenstein*, 161 F.3d 1196, 1199 (9th Cir. 1998) (finding there was no genuine dispute that inmate contact was an essential function of a jail guard position that generally did not require inmate contact, because "[t]he record indicate[d] that both the employer and the written job description identif[ied] inmate contact as a fundamental duty" and "plaintiffs acknowledged that some incidental contact is inevitable"). This reading of plaintiff's

deposition testimony aligns with the position plaintiff has maintained in this litigation: that the written job description is inconclusive evidence of the actual essential functions of her job.

Although the court sees it as a somewhat close call, it concludes that plaintiff has demonstrated a disputed issue of material fact as to whether firearms qualification is an essential function of her job. The Ninth Circuit's decision in *Cripe v. City of San Jose* is instructive in this regard. There, six injured police officers who were no longer able to serve as patrol officers brought an action against the City of San Jose (the "City"), alleging that the City violated the ADA by restricting them to performing only a small number of undesirable positions and preventing them from being promoted to specialized-assignment positions. 261 F.3d at 881. The City required that all officers holding a specialized-assignment position be able to make forcible arrests and asserted that having that ability was an essential job function. *Id.* at 887. While the City's job descriptions made it clear that this requirement applied to all police-officer positions, plaintiffs introduced evidence that making forcible arrests was not an essential function of all specialized-assignment positions. *Id.* The court considered the deposition testimony of a sergeant in the fraud unit of the department, who testified that being able to serve arrests warrants and make arrests was not "for all practical purposes, part of being a fraud investigator." *Id.* Likewise, a former chief of police declared that making forcible arrests was not an essential function of training officers for the Bureau of Administration. *Id.* Although the City introduced its own evidence attesting to the contrary, "this evidence only demonstrate[d] that a factual dispute exist[ed] over whether the function in question [was] essential; it [did] not support the granting of summary judgment to the City." *Id.* at 887–88.

Similarly, the record here reflects that a factual dispute exists. Defendant has proffered the trust fund supervisor written job description and plaintiff's deposition testimony, while plaintiff has come forward with contrary evidence. The evidence presented by plaintiff is sufficient to establish a disputed issue of material fact. *See id.*; *U.S. E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1043, 1057–58 (E.D. Cal. 2015); *Taylor v. Trees, Inc.*, 58 F. Supp. 3d 1092, 1115–17 (E.D. Cal. 2014); *Lazcano v. Potter*, 468 F. Supp.2d 1161, 1167–68 (N.D. Cal. 2007). Because the court must "draw all inferences supported by the evidence in favor" of plaintiff, *Walls*, 653

F.3d at 966, the court concludes that plaintiff has demonstrated a factual dispute as to whether firearms certification is an essential function of the trust fund supervisor position in which she served.

2. Self-Defense Training

Next, the court must consider whether self-defense training is an essential function of the trust fund supervisor position. The trust fund supervisor job description notes that correctional responsibilities precede all others required by the position, and it notes that the "[i]ncumbent must successfully complete specialized training in self defense, management of medical emergencies, safety management and interpersonal communication skills." (Doc. No. 27-4 Ex. A-1 at 16.) BOP's human resource management manual also lists the ability to perform self-defense movements as a requirement. (Doc. No. 27-3 at ¶¶ 5, 6.)

The declarations submitted by plaintiff in opposition to the pending motion for summary judgment state that many injured BOP employees have been permitted, "even on long term bases[,] to sit out of and instead observe self defense training." (Doc. Nos. 34-1, Ex. G ¶ 7; Ex. H ¶ 7; Ex. I ¶ 7.) "[S]uch individuals are not uncommon and may still be able to perform the essential, day-to-day requirements of their positions . . . even if the injury or disability persists for a considerable amount of time, or even presents a permanent limitation." (*Id.*) As noted above, the court will consider this evidence on summary judgment because each declarant's job has required them to attend meetings where the disabilities and injuries of BOP employees have been discussed and considered in the context of accommodations and the granting of alternate assignments. (*Id.*); *see also* 29 C.F.R. § 1630.2(n)(vii).

At her deposition, plaintiff agreed only that the written job description provides that self-defense training is a requirement for the trust fund supervisor position; that all employees working in a BOP correctional institution are responsible for maintaining security in the event of an emergency; and that all employees working in a BOP correctional institution are subject to dangerous conditions such as assaults and hostage situations. (Doc. No. 34-1, Ex. A at 40:7–40:20.) Again, the court does not read that deposition testimony as a concession that self-defense

/////

training is actually an essential function of plaintiff's job, but rather as merely conceding that the written job description for her position includes self-defense training as a requirement.

The court concludes that the evidence presented by the parties on summary judgement establishes that there is a genuine dispute of material fact with respect to whether self-defense training is an essential function of the trust fund supervisor position. *See Cripe*, 261 F.3d at 887–88.

3. Physically Responding into the Secure Institution

Finally, the court must determine whether physically responding into the secure institution in the event of an emergency situation is an essential function of the trust fund supervisor position. The written job description states the following in relevant part:

> Specific correctional responsibilities include custody and supervision of inmates, **responding to emergencies and institution disturbances**, participating in fog and escape patrols, and assuming correctional officer posts when necessary. The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies. The incumbent must be prepared and trained to use physical control situations where necessary, such as in fights among inmates, assault on staff, and riots or escape attempts.

(Doc. No. 27-4 Ex. A-1 at 15, 16) (emphasis added). This written job description—which reads "responding to emergencies"—does not appear on its face to establish that "physically responding into the secure institution" is an essential job function of the position. Defendant's interpretation of the job description is also disputed by the declarations submitted by plaintiff in opposition to the pending motion. Those declarations provide the following:

> While all Bureau of Prisons employees are oft-reminded they are corrections officers first and foremost, my experience has been that many Bureau of Prisons employees who enter the facility and interact with inmates **are incapable of exerting individual physical force to quell an inmate disturbance**. Bureau of Prisons employees come in various, sizes, genders and ages. We also are no longer taught to utilize aggressive physical tactics in dealing with inmates on a day-to-day basis, but instead are trained and encouraged to use verbal commands, the security infrastructure of the facility (i.e., radios, intercoms, the ability to shut off or isolate portions of the facility, the omnipresence of cameras and alarms, etc.), and defensive tactics. Furthermore, each facility has an emergency response plan that involves many different types of emergency responses—**the**

> **emergency response plan does not require or encourage all correctional personnel on duty to act as first responders to the scene of an emergency itself; the emergency response plan can require, for instance, certain personnel to secure the facility, summon assistance from within and without the facility, respond to posts vacated by first responders, to assist in locking down portions of the facility, etc.** It would simply be inaccurate to say that a Bureau of Prisons employee has to be capable of physically overpowering inmates in order to respond to an emergency, even as a first responder, or that those with injuries or physical limitations are incapable of participating in a well-conceived emergency response plan.

(Doc. Nos. 34-1, Ex. G ¶ 6; Ex. H ¶ 6; Ex. I ¶ 6.) According to these declarations submitted by plaintiff, BOP employees are trained to respond in non-physical ways and some are even incapable of responding with physical force. Moreover, BOP's emergency plans do not require every employee to respond inside the secured areas of the institution. The court concludes that plaintiff's evidence as to whether physically responding into the secure institution is an essential function of the trust fund supervisor position also establishes a disputed issue of material fact. *See Cripe*, 261 F.3d at 887–88.

Contrary to the suggestion by defendant in its reply,[7] plaintiff did not concede in her deposition testimony that physically responding to emergencies inside the secure institution is an essential function of her job. Rather, plaintiff testified, in relevant part, as follows:

> Q. The next sentence [in Associate Warden Nicklin's letter] says every position at the institution requires the individual to be physically able to perform correctional work safely and successfully, including the ability to respond effectively to emergencies, at all facilities on the complex. Do you see that?
>
> A. Yes.

---

[7] Defendant argues "that an essential function of a correctional officer position is the ability to perform a wide range of duties involving inmate contact, including the ability to respond to emergencies." (*See* Doc. No. 36 at 5–6.) However, none of the cases cited by defendant in support of that contention specifically addresses the position of trust fund supervisor or BOP employees in correctional institutions whose job descriptions are similar to that of the trust fund supervisor position. As noted above, "[a] highly fact-specific inquiry is necessary to determine what a particular job's essential functions are." *Cripe*, 261 F.3d at 888 n.12. Here, the court is not persuaded by defendant's suggestion that determinations regarding the essential functions of various state correctional officer positions necessarily compels the conclusion that inmate contact is an essential function of the trust fund supervisor position within the BOP.

> Q. It goes on to say that **the ability to respond effectively** to emergencies is an essential function of every position located within a correctional institution because the inability to do so may jeopardize the security of the institution and the safety of staff and inmates. Do you see that?
>
> A. Yes.
>
> Q. Do you agree with that?
>
> A. Yes.
>
> [ . . . ]
>
> Q. Would you agree that the position description for the position of Trust Fund Supervisor, FCI Mendota, required the person holding the position to be prepared to use physical control in the event of a fight among inmates?
>
> A. To be prepared to, yes, **if you were in that vicinity**, yes.
>
> Q. And would the person holding the position of Trust Fund Supervisor also be required according to the position description to be prepared to use physical control in the event of an assault on staff?
>
> A. Yes.
>
> Q. What about in the event of a riot, an inmate riot, would the Trust Fund Supervisor according to the position description be required to be prepared to use physical control in the event of an inmate riot?
>
> A. Yes. I think emergency plans would be activated at that point.

(Doc. No. 34-1 Ex. A, 34:22–35:13.) The court interprets this portion of plaintiff's deposition as reflecting her testimony that responding effectively to emergency situations within the prison is an essential function of her job, but not as a concession that a physical response is an essential function of that job.[8] Moreover, the court does not read plaintiff's testimony that being prepared to use physical control "if you were in that vicinity" necessarily implies that responding inside the secure institution is an essential job function for her position. Instead, plaintiff advances the position that the essential function of responding effectively can be achieved in many ways: by physically responding into the secure institution, which requires one to be prepared to use

[8] Plaintiff does concede that responding effectively is an essential function of her job. However, defendant did not move for summary judgment on that ground and the court need not consider whether plaintiff was a qualified individual who could perform that job function.

physical control, or responding elsewhere, which may not require physical control. The court does not interpret plaintiff's deposition testimony as being inconsistent with that litigation position.

In conclusion, the evidence before the court on summary judgment establishes disputed issues of material facts with respect to whether firearms certification, self-defense training, and physically responding into the secure institution are essential functions of plaintiff's job. Based on the present evidence, a reasonable jury could find that, despite her request to be excused from these functions, plaintiff was a "qualified individual" who may assert a claim under the Rehabilitation Act for failure to accommodate her request for accommodation. Thus, defendant's motion for summary judgment as to that claim will be denied.[9]

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment (Doc. No. 27) is denied.

IT IS SO ORDERED.

Dated: **April 24, 2020**

Dale A. Drozd

UNITED STATES DISTRICT JUDGE

[9] Plaintiff argues that "because the defendant failed to challenge plaintiff's EEOC reprisal claim, and because there does not appear to be any procedural or substantive legal reason for the Court to consider entertaining summary judgment *sua sponte* as to that cause of action, this case must proceed to trial." (Doc. No. 33 at 5.) In reply, defendant argues that its motion for summary judgment is addressed solely to plaintiff's Rehabilitation Act claim because, to the extent plaintiff's reprisal claim is based on defendant's alleged failure to accommodate her, a finding that plaintiff could not perform the essential functions of her position would be dispositive of her EEOC reprisal claim as well. (Doc. No. 36 at 10–11.) The court has concluded that, based upon the evidence now before it, defendant is not entitled to summary judgment in its favor as to plaintiff's Rehabilitation Act claim for the reasons explained above. Thus, the pending motion does not call upon the court to address plaintiff's Title VII reprisal claim.